UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNDEEP SINGH, through his next friend Chanelle Green Navarro,<br><br>  Plaintiff,<br><br>v.<br><br>JAMES JANECKA, Warden, Adelanto ICE Processing Center,<br><br>  Defendant. | Case No. 5:26-cv-00671-SPG-AJR<br><br>**ORDER GRANTING, IN PART, SECOND AMENDED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [ECT NO. 32]** |

Petitioner Sundeep Singh ("Petitioner") is a noncitizen detained by Respondent James Janecka ("Respondent") at the Immigration and Customs Enforcement ("ICE") Processing Center in Adelanto, California. *See* (ECF No. 34 ("Singh Declaration") ¶ 1). Following retention of court-appointed counsel, Petitioner filed an Amended Petition for a Writ of Habeas Corpus and a Second Amended *Ex Parte* Application for a Temporary Restraining Order, challenging his continued detention and his possible removal to a country other than Germany, where he was previously ordered removed. *See* (ECF No. 33 ("Amended Petition"); ECF No. 32 ("Second Amended Application")).

The Court has read and considered the Second Amended Application and concluded that the Second Amended Application is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the submissions, the relevant law, and the record in this case, the Court GRANTS the Second Amended Application

insofar as Petitioner seeks his release from custody and an order to require the Government to follow its own regulations before re-detaining him. *See* (ECF No. 32-1 ("Proposed TRO Order")). The Court DENIES the Second Amended Application insofar as Petitioner seeks an injunction to prevent the Government from removing him to a third country without following the statutory process for third-country removal. *See* (*id.*).

## I. Background

### A. Factual Background

Petitioner was born in Germany in 1986. *See* (Singh Decl. ¶ 4). Both of his parents were Indian citizens. *See* (*id.*). When he was approximately five years old, Petitioner moved to the United States with his mother and his older brother. *See* (*id.*). On or about October 26, 2009, Petitioner was convicted of driving under the influence of alcohol, in violation of California Vehicle Code § 23152(b), and sentenced to two days in jail. *See* (*id.* ¶ 5); *see also* (ECF No. 6-1 ("Suarez Declaration") ¶ 5). On May 17, 2011, Petitioner was released from criminal custody and placed in immigration custody, pending removal proceedings. *See* (Singh Decl. ¶ 6). On June 16, 2011, an immigration judge ordered Petitioner's removal to Germany. *See* (*id.* ¶ 7). To facilitate Petitioner's removal, ICE directed Petitioner to apply for German travel documents. *See* (*id.* ¶ 8). Approximately two months later, ICE directed Petitioner to apply for Indian travel documents. *See* (*id.* ¶ 10). ICE released Petitioner from custody under an order of supervision ("OSUP") on or around November 2011. *See* (*id.* ¶ 11).

Since Petitioner was released from immigration custody, at the direction of ICE, he has periodically completed applications for German and Indian travel documents. *See* (*id.* ¶ 14). He estimates that he has filled out such applications approximately four times since 2011. *See* (*id.*). However, he claims that ICE has never told him whether India or Germany has responded to, confirmed, or denied any of his applications. *See* (*id.*). He says that, at one point, he called the German consulate, and the person who he spoke to said that he was not a German citizen. *See* (*id.* ¶ 9).

1    In the past few years, Petitioner has been arrested and convicted of several crimes.
2 On or about June 22, 2022, Petitioner was convicted of false imprisonment, in violation of
3 California Penal Code § 236, and sentenced to 111 days in jail. *See* (Suarez Decl. ¶ 7). On
4 or about August 18, 2023, Petitioner was convicted of violating a protective order, in
5 violation of California Penal Code § 166(c)(1), and sentenced to 29 days in jail. *See* (*id.*
6 ¶ 8). On or about May 21, 2024, Petitioner was convicted of disturbing the peace, in
7 violation of California Penal Code § 415(2), and sentenced to 29 days in jail. *See* (*id.* ¶ 9).
8 However, according to Petitioner's declaration, ICE has never cited Petitioner for being in
9 violation of his OSUP or cited his conviction as a basis to revoke his OSUP. *See* (Singh
10 Decl. ¶ 13). Respondent does not contest this assertion. *See generally* (ECF No. 37
11 ("Opposition")).
12   In June 2025, Petitioner enrolled in ICE's Intensive Supervision Appearance
13 Program ("ISAP"), which allowed ICE to monitor Petitioner's movements through a phone
14 application and allowed Petitioner to check-in electronically with ICE. *See* (Singh Decl.
15 ¶ 15). On approximately November 13, 2025, Petitioner received an ISAP notification that
16 he was required to report to an ICE office in San Bernadino, California for an in-person
17 check-in. *See* (*id.* ¶ 16). Petitioner reported, as instructed, on November 20, 2025. *See*
18 (*id.* ¶ 17). After Petitioner waited for around 30 minutes, he was approached by someone,
19 led to a room, and taken into custody. *See* (*id.*). One of the agents who took Petitioner
20 into custody told him that "they were taking [him] to another office to check [his] case
21 because there was a new administration and [he] had a final order of removal." (*Id.* ¶ 18).
22 Petitioner was then transported to another location and placed in a holding cell with three
23 other handcuffed individuals. *See* (*id.* ¶ 19). In custody, an ICE officer told Petitioner that
24 ICE was revoking his supervised release. *See* (*id.*). After roughly 14 hours in the holding
25 cell, Petitioner was transported to the ICE Processing Center in Adelanto, California. *See*
26 (*id.* ¶ 20).
27   Petitioner believes Germany and India are unlikely to grant him travel documents
28 and fears he will be deported to a "random" third country. *See* (*id.* ¶ 21). To avoid this,

Petitioner applied for Mexican travel documents, since his wife has family in Mexico. *See* (*id.*). In December 2025, Petitioner met with Mexican officials but, on January 6, 2026, Mexico denied his request. *See* (*id.*). While in custody, Petitioner also applied for German travel documents. *See* (*id.* ¶ 23). As of January 21, 2026, his application for German travel documents is still pending. *See* (*id.* ¶ 24).

Petitioner claims that his family is suffering as a result of his continued detention. *See* (*id.* ¶¶ 25–26). Petitioner's wife is injured and cannot work. *See* (*id.* ¶ 25). Therefore, before he was re-detained, Petitioner was his family's sole provider. *See* (*id.*). Since Petitioner was re-detained, his wife has had to sell most of their possessions to pay rent and had to rely on assistance from churches and food banks to feed herself and their eight-year-old son. *See* (*id.*). Petitioner's son has received counseling to deal with the trauma of his father's detention. *See* (*id.* ¶ 26).

### B.  Procedural Background

Petitioner filed an initial Petition for a Writ of Habeas Corpus on February 13, 2026. *See* (ECF No. 1 ("Petition")). On the same day, Petitioner filed an *Ex Parte* Application for a Temporary Restraining Order. *See* (ECF No. 2 ("Application")). Petitioner filed both his Petition and his Application without the assistance of counsel. On the same day that he filed his Petition and Application, Magistrate Judge Joel Richlin referred the case to the Federal Public Defender's Office. *See* (ECF No. 4).

In the Application, Petitioner argued that his continued detention violated 8 U.S.C. § 1231(a)(6), as interpreted by *Zadvydas*. *See* (Application at 2). He did not say he had previously been detained by ICE. *See generally* (*id.*). He also did not detail his prior applications for German and Indian travel documents. *See generally* (*id.*). Instead, Petitioner only argued that he was subject to a 2011 order of removal, but he was "stateless" and ICE had told him that "prior denial records" from an unidentified embassy had been "lost." *See* (*id.* at 1–2). Petitioner also only requested temporary relief in the form of a stay of removal. *See* (ECF No. 2-1).

On February 18, 2026, the Court entered an order denying Petitioner's Application. *See* (ECF No. 12 ("Order Denying TRO")). In that order, the Court concluded that Petitioner was unlikely to succeed on the merits of his claim under § 1231(a)(6) because he did not "contend that he has previously been subject to immigration detention." (*Id.* at 6). Thus, on the record presented, his detention was presumptively reasonable under *Zadvydas*. *See* (*id.*). The Court also found that Petitioner had not shown irreparable harm, insofar as he only requested a stay of removal. *See* (*id.* at 6–7). The Court explained that the Petitioner did not "challenge the legality of the order of removal," "address the Court's jurisdiction to consider such a challenge or to order a stay of removal," or "seek any form of relief other than release from custody." (*Id.* at 7). Therefore, finding that Petitioner had not shown a likelihood of success on the merits or irreparable harm, the Court denied the Application "without prejudice to re-filing at a later date based on a sufficient showing of the need for interim relief." (*Id.*).

The next day, on February 19, 2026, Petitioner filed a First Amended Emergency *Ex Parte* Application for Temporary Restraining Order and Stay of Removal. *See* (ECF No. 14 ("First Amended Application")). As with the initial Application, Petitioner filed his First Amended Application without the assistance of counsel. On February 20, 2026, the Court set a briefing schedule, with a hearing on the First Amended Application set for February 26, 2026. *See* (ECF No. 21). On February 23, 2026, the Federal Public Defender's Office entered an appearance on behalf of Petitioner. *See* (ECF No. 27). Minutes later, Respondent filed his brief in opposition to the First Amended Application. *See* (ECF No. 28); *see also* (ECF No. 29, Declaration of Devon Hein ("Hein Declaration"), ¶¶ 2–3). That afternoon, Petitioner's counsel emailed Respondent to request a continuance. *See* (Hein Decl. ¶ 5).

Respondent refused to agree to a continuance and, on February 24, 2026, Petitioner's counsel filed a request for a continuance with the Court. *See* (*id.* ¶¶ 5–6); *see also* (ECF No. 29 ("Request")). In the Request, Petitioner indicated that he would like to file, with the assistance of counsel, an amended habeas petition and a second amended application

for a temporary restraining order. *See* (Hein Decl. ¶¶ 5–6). On February 25, 2026, the Court granted Petitioner's Request, set deadlines for Petitioner to file an amended habeas petition and for the parties to brief a second amended application for a temporary restraining order, and scheduled a hearing for March 4, 2026. *See* (ECF No. 31).

On February 26, 2026, Petitioner filed his Amended Petition, his Second Amended Application, and a declaration in support of his Second Amended Application. On March 2, 2026, Respondent filed his Opposition. On March 3, 2026, Petitioner filed a reply brief in support of his request for preliminary injunctive relief. *See* (ECF No. 37 ("Reply")).

## II. LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." (internal quotation marks and citation omitted)). A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

"[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of

equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The court is permitted to consider the parties' pleadings, declarations, affidavits, and exhibits submitted when deciding an application for a temporary restraining order. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by the parties." (citations omitted)); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The urgency of the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence. *See id.*

## III.  DISCUSSION

Petitioner argues that his continued detention violates 8 U.S.C. § 1231(a)(6), as interpreted by *Zadvydas v. Davis*, 533 U.S. 678 (2001). *See* (Amended Petition at 3–5). He also challenges the process that the Government followed in revoking his OSUP. *See* (*id.* at 5–7). Finally, he argues that, to the extent he is detained to effectuate his removal to a third country, ICE must provide him with notice and an opportunity to request deferral or withholding of removal. *See* (*id.* at 8–9). The Court will address each argument in turn.

### A.  Likelihood of Success on the Merits

Based on the record presented, the Court concludes that Petitioner is likely to succeed on the merits in his challenge to his continued detention. However, as discussed below, Petitioner's request for an injunction to require the Government to follow the law before attempting to remove him to a third country is not ripe for review.

1. §  1231(a)(6)

First, Petitioner challenges his continued detention under 8 U.S.C. § 1231(a)(6). In general, a noncitizen ordered removed must be removed "from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). The government is required to detain the noncitizen for this initial 90-day period for the purpose of effectuating removal. *See* 8 U.S.C. § 1231(a)(2)(A). If removal is not effectuated during this period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3). However, under 8 U.S.C. § 1231(a)(6), certain "[i]nadmissible or criminal aliens" subject to an order of removal "may be detained beyond the removal period." *See* 8 U.S.C. § 1231(a)(6).

In *Zadvydas*, the Supreme Court "read an implicit limitation" into § 1231(a)(6) to prevent the Government from indefinitely detaining noncitizens subject to an order of removal. *See* 533 U.S. at 689. The Court explained that an interpretation of § 1231(a)(6) permitting indefinite immigration detention would "raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause. *Id.* at 690. Therefore, the Court interpreted § 1231(a)(6) to only permit detention "for a period reasonably necessary to secure the alien's removal." *Id.* at 683 (emphasis omitted). "[F]or the sake of uniform administration in the federal courts," the Supreme Court proceeded to recognize that detention to effect removal is "presumptively reasonable" for up to six months. *Id.* at 701.

Where a noncitizen is detained for more than six months following an order of removal, courts employ a burden-shifting framework. *See id.* A noncitizen challenging their detention under § 1231(a)(6) bears the initial burden of showing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* Where a noncitizen meets their burden, "the Government must respond with evidence sufficient to rebut that showing." *Id.* In assessing whether immigration detention is reasonably necessary to secure a noncitizen's removal, "as the period of prior postremoval confinement grows, what counts as 'the reasonably foreseeable future' conversation [must] shrink." *Id.* However, *Zadvydas*'s "6-month presumption . . . does

not mean that every alien not removed must be released after six months." *Id.* Instead, "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

The six-month period set out in *Zadvydas* "does not reset when the government detains an alien . . ., releases him from detention, and then re-detains him again." *Sied v. Nielsen*, No. 17-CV-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018). Instead, courts within the Ninth Circuit "appear to uniformly aggregate detention periods, even over the span of decades." *Phan v. Warden of Otay Mesa Det. Facility*, No. 25-CV-02369-AJB-BLM, 2025 WL 3141205, at *3 (S.D. Cal. Nov. 10, 2025) (collecting cases). Similarly, outside of the Ninth Circuit, "[m]ost courts to consider the issue have concluded that the *Zadvydas* period is cumulative." *Siguenza v. Moniz*, No. 25-CV-11914-ADB, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025). Therefore, the Court looks to the cumulative time Petitioner has spent in detention, rather than the duration of Petitioner's re-detention.

Initially, in 2011, the Government detained Petitioner for roughly four months. *See* (Singh Decl. ¶¶ 7–11 (Petitioner was ordered removed on June 16, 2011, and remained in custody until approximately November 2011)). Following his release from custody in or around November 2011, Petitioner remained free from immigration detention, subject to the OSUP, for roughly 14 years. *See* (*id.* ¶¶ 11, 17)). ICE revoked the OSUP and re-detained Petitioner on November 20, 2025. *See* (*id.* ¶ 17). Petitioner has since been detained for roughly three months and, in all, has been detained for an aggregate period of seven months.

In assessing whether Petitioner's continued detention is reasonably necessary to effect his removal, the Court is satisfied that Petitioner has sufficiently shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. As noted, Petitioner was ordered removed to Germany on June 16, 2011. *See* (Singh Decl. ¶ 7). However, although Petitioner was born in Germany, Germany does not consider him to be a citizen. *See* (*id.* ¶ 9). While initially detained by immigration authorities, in 2011, the Government "interviewed [Petitioner],

took [his] picture, and had [him] fill out an application" for German travel documents. *See* (*id.* ¶ 8). However, seemingly unable to secure travel documents, the Government released Petitioner from immigration custody in or around November 2011. *See* (*id.* ¶ 11). Since he was released from custody in 2011, Petitioner has re-applied for German travel documents approximately four times. *See* (*id.* ¶ 14).

Finding that Petitioner has met his burden, Respondent has not submitted sufficient evidence to rebut Petitioner's showing that there is good reason to believe his removal is unlikely in the foreseeable future. In Opposition, Respondent only argues that "travel documents to Germany remain pending." (Opp. at 4). However, Respondent has not submitted evidence or argument why Germany is likely to issue travel documents to Petitioner, where Germany previously determined Petitioner is not a German citizen and has repeatedly refused to issue him travel documents. *See* (Singh Decl. ¶¶ 8–9, 14). Therefore, the Court finds that Petitioner is likely to succeed on the merits of his claim under § 1231(a)(6).

### 2. Regulations Governing Revocation of Release

Petitioner also challenges the process by which the Government revoked his OSUP. *See* (Amended Petition at 5–6). "Government agencies are required to follow their own regulations." *Hoac v. Becerra*, No. 25-cv-1740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025); *see also United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). Per agency regulations, ICE can revoke a noncitizen's release on an order of supervision based upon a violation of the conditions of an order of supervision or to effect removal. *See* 8 C.F.R. § 241.13(i)(1)–(2). To revoke a noncitizen's release to effect removal, ICE must make a determination that, "on account of changed circumstances, . . . there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). Upon revocation, ICE must notify a noncitizen "of the reasons for revocation of his or her release." 8 C.F.R. § 241.13(i)(3). ICE also must conduct an "initial informal interview promptly after his or her return to . . . custody to afford the alien an opportunity to respond to the reasons for revocation stated in the

notification." *Id.* At this interview, the noncitizen may "submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future." *Id.*

Here, in connection with Petitioner's detention, ICE served Petitioner with a "Notice of Revocation of Release." (Suarez Decl. ¶ 10). In the Notice of Revocation, ICE informed Petitioner that it was revoking the OSUP "based on a review of [his] official alien file and a determination that there are changed circumstances in [his] case." (ECF No. 6-2, Exhibit A). The Notice of Revocation does not clearly set out the basis for ICE's determination of changed circumstances. *See* (*id.*); *see Duong v. Noem*, No. 25-CV-3142 JLS (SBC), 2025 WL 3268414, at *3 (S.D. Cal. Nov. 24, 2025) (finding a similar statement insufficient to provide notice). Instead, the Notice of Revocation states that Petitioner was previously ordered removed to Germany and his "case is under current review by Germany for the issuance of a travel document." (*Id.*). However, in a previous filing, Respondent submitted a declaration showing ICE only submitted a request for German travel documents roughly two months after detaining Petitioner. *See* (Suarez Decl. ¶ 12). Petitioner also claims, and Respondent does not dispute, that Petitioner has not received an informal interview to respond to the Government's assertion of changed circumstances. *See* (Singh Decl. ¶ 24); *see also Pham v. Noem*, No. 5:25-CV-03373-MEMF-PD, 2025 WL 3763374, at *5 (C.D. Cal. Dec. 22, 2025) (government violated § 241.13(i)(3) by failing to provide informal interview to noncitizen detained for roughly two months).

Here, Petitioner is likely to succeed on the merits of his claim that ICE violated its own regulations by failing to provide him with adequate notice and an informal interview.

### 3. Third-Country Removal

Finally, Petitioner argues that, "[t]o the extent [his] detention in immigration custody is to effectuate removal to a third country, that violates the Due Process Clause because ICE has not given him sufficient notice of the proposed third country and an opportunity to request deferral or withholding of removal to that country under either statute or the Convention Against Torture." (Amended Petition at 8). To address this possibility,

Petitioner seeks an injunction to prevent Respondent from "removing [him] to any country other than Germany, without first following the consecutive procedures of 8 U.S.C. § 1231(b)(2)." (Second Amended Application at 4).

In support, Petitioner argues that "ICE has repeatedly asserted that it is their right and policy" to remove noncitizens to a third country without advance notice. *See* (Reply at 5 (citing *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2026 WL 521557, at *34 (D. Mass. Feb. 25, 2026)). However, on the record presented, Petitioner has not shown a sufficient likelihood that the Government will attempt to remove him to a country, other than Germany, without first providing advance notice. *Cf. Dao v. Bondi*, No. 2:25-CV-02340-LK, 2026 WL 18626, at *6 (W.D. Wash. Jan. 2, 2026) (allegations regarding "the Government's efforts to remove individuals to third countries" failed "to establish a genuine threat of enforcement" against petitioner for purposes of ripeness).

Petitioner primarily bases his third country removal claim on the Government's prior attempts to remove him to India and Mexico. *See* (Reply at 5). Specifically, in 2011 and periodically thereafter, ICE directed Petitioner to apply for Indian travel documents. *See* (Singh Decl. ¶¶ 10, 14). Following his detention in 2025, Petitioner also voluntarily decided to "seek removal to Mexico." (*Id.* ¶ 21). Neither circumstance is sufficient to show that Petitioner faces "an imminent threat" of "third-country removal without constitutionally and statutorily required procedures." *Yousufi v. Hermosillo*, No. 2:25-CV-2098, 2026 WL 482416, at *2 (W.D. Wash. Feb. 20, 2026). Petitioner does not argue that ICE has attempted to remove him to India since re-detaining him and also does not argue that, by directing Petitioner to apply for Indian travel documents, ICE violated his rights. Similarly, Petitioner has not shown, based on his own request that ICE attempt to remove him to Mexico, that ICE is likely to attempt to remove him to a third country without providing him notice and an opportunity to be heard. Therefore, the Court finds, at this juncture, that Petitioner has not shown he is likely to succeed on his request for an injunction to require Respondent to refrain from removing him to a third country without following the procedures set out in 8 U.S.C. § 1231(b)(2).

### B. Irreparable Harm

Petitioner has sufficiently shown that he faces irreparable harm, absent his release from custody. "The irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment) are self-evident." *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d 1021, 1037 (N.D. Cal. 2025) (internal quotation marks, alterations, and citation omitted); *see also Padilla v. Bowen*, No. 2:25-CV-10780-CAS-SK, 2025 WL 3251368, at *9 (C.D. Cal. Nov. 21, 2025) ("The Ninth Circuit has recognized the 'irreparable harms imposed on anyone subject to immigration detention'" (quoting *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). Further, beyond depriving him of his liberty, Petitioner contends that his wife and child have suffered as a result of his detention. *See Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) (incarceration "has a detrimental impact on [an] individual" because "it often means loss of a job" and "disrupts family life."). Specifically, Petitioner claims that his wife is unemployed and, without his income, she has "had to sell their belongings and rely on food banks and churches" to feed herself and their son. (Amended Petition at 2–3). Petitioner also claims that his son has "been traumatized by his father's disappearance, requiring counseling at school." (*Id.* at 3).

### C. Balance of the Equities and Public Interest

When the government is the nonmoving party on a TRO application, the Court's consideration of the balance of the equities and public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). While there is a "public interest in prompt execution of removal orders," *id.* at 436, permitting the Government to unlawfully detain Petitioner does not serve this interest. By contrast, "[t]he public has a strong interest in upholding procedural protections against unlawful detention." *Diaz v. Kaiser*, No. 3:25-CV-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025); *see also Vargas v. Jennings*, No. 20-CV-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020) ("Just as the public has an interest in the orderly and efficient administration of this country's immigration laws, . . . the public has a strong interest in upholding procedural protections against unlawful detention.

(internal quotation marks and citations omitted)). Thus, the Court finds that each of the *Winter* factors supports issuing a temporary restraining order.

### D. Security

Petitioner further requests the Court waive the bond requirement under Federal Rule of Civil Procedure 65(c). *See* (Second Amended Application at 4–5). Under Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (recognizing that district courts have "discretion as to the amount of security required, if any"). Here, Respondent is unlikely to incur significant costs in complying with this order, and requiring a bond "would have a negative impact on plaintiff's constitutional rights." *Los Angeles Press Club v. City of Los Angeles*, No. 2:25-cv-05423-HDV-E, 2025 WL 2640421, at *17 n.16 (C.D. Cal. Sept. 10, 2025) (quoting *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996)). The Court therefore waives the bond requirement, and no security is required. *See, e.g.*, *Delkash v. Noem*, No. 5:25-cv-01675-HDV-AGR, 2025 WL 2683988, at *6 n.3 (C.D. Cal. Aug. 28, 2025) (dispensing of bond requirement in issuing a preliminary injunction order to release petitioner from immigration detention); *Aceros v. Kaiser*, No. 25-cv-06924-RMI-EKL, 2025 WL 2453968, at *3 (N.D. Cal. Aug. 16, 2025) (dispensing of bond requirement in granting a temporary restraining order).

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Application and ORDERS as follows:

1. Respondent shall immediately release Petitioner from custody, under the terms of his prior order of supervision.
2. Respondent is enjoined from re-detaining Petitioner, unless Respondent follows the procedural safeguards set out in 8 C.F.R. §§ 241.4 and 241.13.

3. Respondent is ORDERED TO SHOW CAUSE why a preliminary injunction should not issue at an in-person hearing on Wednesday, March 18, 2026, at 9:00 a.m. in Courtroom 5C. Petitioner shall file an opening brief and related submissions no later than Wednesday, March 11, 2026, at 5:00 p.m. Respondent shall file an opposition no later than Friday, March 13, 2026, at 5:00 p.m. Petitioner shall file a reply brief no later than Monday, March 16, 2026, at 5:00 p.m.

3. The parties may file and the Court will consider a stipulation requesting an extension of the briefing schedule so long as the parties also agree to an extension of the TRO.

4. The Petition is referred to the assigned Magistrate Judge for further adjudication. The parties are directed to follow the orders of the Magistrate Judge regarding briefing and further habeas proceedings.

**IT IS SO ORDERED.**

DATED: March 9, 2026

UNITED STATES DISTRICT JUDGE